## EASLEY *v.* PATTERSON.

## Opinion delivered February 2, 1920.

1. HIGHWAYS—VALIDITY OF SPECIAL ACTS.—It is not essential to the validity of special acts creating road improvement districts that they contain express declarations that the roads to be improved have already been established as public roads; if they are not public roads, it devolves upon those assailing the validity of the acts to make it so appear.

2. HIGHWAYS—DESCRIPTION OF ROAD TO BE IMPROVED.—Where a special act provides for the improvement of a public road between two towns and continuing through and to certain other towns named, an allegation that there are several public roads between the two first mentioned towns is insufficient to render uncertain the description of the road, since there is nothing to show that there is not a particular road forming a continuous route from the first to the last named town.

3. HIGHWAYS—DESCRIPTION OF ROAD.—The words in Road Acts 1919, No. 415, creating a road improvement district, "thence in a general southerly direction on the most practical route to an intersection with the road from Rogers to Garfield," do not contemplate the improvement of a road that is not public.

4. HIGHWAYS—SINGLE IMPROVEMENT.—Though the territory embraced by three road improvement districts created by Road Acts 1919, Nos. 149 (amended by 240), 238 and 415, is large, and the roads to be improved are extensive, the courts can not say that the roads can not be treated as a single improvement, and that the legislative finding to that effect is arbitrary.

5. HIGHWAYS — INVASION OF COUNTY COURT'S JURISDICTION.—The above acts held not to invade, but to recognize clearly, the jurisdiction of the county court over public roads.

6. HIGHWAYS — PROVISION FOR ADDITIONAL ROADS.—A provision in each of the above-mentioned acts directing the boards of commissioners, on petition of 51 per cent. of the property owners in number, acreage or valuation in any district or part of the county not included in the acts asking that such territory be embraced in the districts for the purpose of building roads not included in the acts, to include said territory in the districts, *held* void as not providing for assessment of benefits.

7. HIGHWAYS—PROVISION FOR REPAIR.—The provision in the above acts authorizing the boards of commissioners "to build, construct, maintain and repair said road or roads within said district" *held* not invalid as authorizing them to maintain and repair the roads without orders of the county court.

8. HIGHWAYS—APPROVAL OF PLANS BY COUNTY COURT.—The above-mentioned acts do not invade the county court's jurisdiction, though they fail to provide that the plans for improvement made by the boards of commissioners of the districts must be submitted to and approved by the county court.

9. HIGHWAYS—ASSESSMENT OF BENEFITS.—The above acts were not unenforceable because the commissioners in making assessments were required to enter the lands on the tax books in convenient subdivisions as surveyed by the United States Government, though town lots could not be so described; the above requirement being merely directory.

10. HIGHWAYS—POWER TO VACATE ROADS.—The above acts do not empower the boards of commissioners to vacate public roads.

11. CONSTITUTIONAL LAW—LEGISLATIVE DETERMINATION OF BENEFITS.—The legislative determination as to benefits is conclusive unless manifestly arbitrary and without foundation.

12. HIGHWAYS—PERPETUITY IN COMMISSIONERSHIPS.—The above acts are not void because the commissioners are kept in power with authority to name their successors.

13. STATUTES—LOCAL ACTS—NOTICE.—It will be conclusively presumed that the Legislature found that the notice required by the Constitution (article 5, section 26) to be given of the introduction of local or special bills was given.

Appeal from Benton Chancery Court; *Ben F. McMahan,* Chancellor; affirmed.

*E. P. Watson,* for appellants.

1. The power to create special road districts for improvement is given only for the purpose of improving public county roads already laid out or recognized by the county court. The improvement necessarily becomes a part of the original road. 92 Ark. 93; 89 *Id.* 513; 118 *Id.* 294; 133 *Id.* 64; 118 *Id.* 119; Page & Jones, Tax by Assessment, § 859. The roads also must be definitely designated and described. Section 2 of the act is void, being too vague and uncertain. 118 Ark. 119; Page & Jones on Tax by Assessment, § 859. A "roving commission" can not be given to determine what roads are to be improved. 118 Ark. 294; *Ib.* 119; 32 *Id.* 131.

2. The Legislature can not create a public corporation in violation of article 12, section 2 of our Constitution. 78 Ark. 580.

3.   The commissioners named in section 1 of the act are public officers.  69 Ark. 460; 84 *Id.* 540; 24 Mich. 59; *Ib.* 62-3; 17 Am. Ann. Cas. 449.

4.   The Legislature can not appoint a public officer for the full term of his office.  24 Mich. 68; 13 *Id.* 136.

5.   Being public officers, they must be elected by a *viva voce* vote of both houses.  Art. 5, § 14, and art. 3, sec. 12, Constitution.

6.   The act is void because it creates a perpetuity of office by giving the commissioners power to elect their successors in violation of section 19, Bill of Rights to our Constitution.

7.   The act does not state that the roads are situate in the district, and section 2 of the act declares that the district is organized to improve roads in Benton County, thus interfering with the jurisdiction and power of the county court. 25 A. & E. 1179; 153 Ill. 348; 65 Pa. St. 182; 38 N. J. L. 410.

8.   The act is in many other ways and for many other reasons void.  It gives the commissioners legislative powers.  The act is impracticable and uncertain; it does not provide for an appeal; it gives the exclusive right to a board of assessors to make assessments for benefits and to hear objections; it takes away from minors and insane the right to protection or hearing by guardian or attorney *ad litem;* it fixes a permanent lien for taxes without notice; the benefits are not equal and uniform and all costs are assessed property in the district, including lands of the State; the act is arbitrary and unjust.   32 Ark. 131; *Milwee v. Tribble,* 139 Ark. 574; 25 A. & E. Enc. (2 Ed.), 1224 and note; 134 Ark. 411; 132 *Id.* 141; 21 *Id.* 378; 102 *Id.* 553; 120 *Id.* 277.

*Duty & Duty, J. W. Nance, Tom Williams, Jeff Rice, McGill & McGill* and *Lee Seamster,* for appellees.

None of the attacks on the act are tenable; many of them have been settled by this court.  99 Ark. 100; 76 *Id.* 197; 102 *Id.* 277; 112 *Id.* 277; 114 *Id.* 156; 119 *Id.* 314; 120 *Id.* 278; 102 *Id.* 553; 213 S. W. 762; 121 Ark. 325;

130 *Id.* 507, 503; 215 S.W. 255; 92 Ark. 93; 98 *Id.* 113; 78 *Id.* 580; 55 *Id.* 148; 103 *Id.* 452; 59 *Id.* 513; 109 *Id.* 90; 215 S. W. 255; 214 *Id.* 50; 119 Ark. 188; 107 *Id.* 285; 112 *Id.* 557; 92 *Id.* 93; 109 *Id.* 556, and others.

McCULLOCH, C. J.   The General Assembly of 1919 (regular session) passed three special statutes creating three separate improvement districts in Benton County for the purpose of improving certain specified roads. The districts were designated in the statute, respectively, as "Road Improvement District No. 2 of Benton County," "Road Improvement District No. 3 of Benton County," and "Road Improvement District No. 4 of Benton County."   See Act No. 149, approved March 1, 1919, creating District No. 2, and Act No. 238, approved March 11, 1919, creating District No. 3, and Act No. 415, approved March 27, 1919, creating District No. 4.   A later statute was passed during the same session (Act No. 240) amending the statute creating District No. 2, by authorizing an extension of the road to be improved and the addition of other territory.

Owners of real property in each of the districts instituted separate actions attacking the validity of each of the statutes, and they have appealed from an adverse decree of the chancery court upholding the statutes. The three cases involve substantially the same questions, and have been consolidated here for the purpose of being heard.

Learned counsel for appellants present in their argument thirty-five separate and distinct grounds for the attack upon these statutes, the greater portion of which grounds have been settled adversely to their contention by former decisions of this court.   The questions are so plainly settled by those decisions that it is unnecessary to refer to them for the purpose of application.   We will, therefore, confine the discussion to the questions involved which are fairly open to debate under our own decisions.

The statutes follow, in a great measure, the usual form adopted by the lawmakers in the enactment of special statutes creating road improvement districts by de-

scribing the boundaries of the district and the roads to be improved, and by conferring authority on the commissioners to prepare plans for the improvement, to let contracts therefor, and to assess benefits and levy assessments thereon, and to borrow money and issue bonds.

The road or roads to be improved in District No. 2 are described in Act No. 149 as beginning at a point in a certain section where the road intersects the Eureka Springs-Seligman road "and running in a southwesterly direction through Garfield, Bestwater, Avoca, Rogers, Lowell, and to the south county line" in a certain section; also a road beginning at Rogers connecting with the above described road "and running west through Bentonville, Centerton to Decatur;" and also another road beginning on the Missouri line in a certain section "and running south through Sulphur Springs, Gravette, Decatur, Gentry, Siloam Springs and to the Oklahoma State line."

The amendatory statute referred to above provides for an extension of this road "from Siloam Springs in a southeasterly direction to the Washington County line, and intersecting said Washington County line," and "thence east with said Washington County line and with the south line of Benton County to the southeast corner" of a certain section. It will be seen from this description and by comparison with a map of Benton County, of which we take notice so far as the location of towns is concerned and the sections of land, there is a provision for a road running practically north and south, near the east boundary of the county from a point near the Missouri line southerly through the city of Rogers to the Washington County line; and also a road substantially paralleling the western boundary of the county from a point on the Missouri line south to the Washington County line, and also a road from the city of Rogers connecting with the eastern road just mentioned, and running northwesterly through the city of Bentonville and certain other municipalities, and connecting with the western road at Decatur.

The statute creating District No. 3 provides for a road beginning on the Missouri line in a certain section near the town of Carvena, Missouri, thence in a southeasterly direction through Bella Vista to Bentonville; thence in a southerly direction through Cave Springs to the Washington County line to a point in a certain section; also a road beginning at the intersection of the road from Rogers to Bentonville in District No. 2, near Droke schoolhouse in a certain section; thence in a westerly direction to Morning Star schoolhouse; thence south and west to Vaughan, thence south and west through Mason Valley, to an intersection with the line between two specified sections of land; and thence along or near the section line and through the town of Highfill, thence in a general westerly direction through Springtown, thence in a general southwesterly direction to an intersection with the road from Siloam Springs to Gentry in District No. 2; also a road beginning at or near Morning Star schoolhouse and running west one-quarter mile, thence north to an intersection with the Bentonville and Center road in District No. 2.

The statute creating District No. 2 authorizes the improvement of a road beginning at Elkhorn tavern and running westerly to the town of Pea Ridge, "thence in a general southerly direction on the most practical route to an intersection with the road from Rogers to Garfield" in District No. 2 at or near the town of Rogers; also a road beginning at the southeast corner of the public square in Bentonville, thence in a northeasterly direction to an intersection with the above described road from Pea Ridge to Rogers, at or near the bridge across Sugar Creek.

In each of the statutes the roads are mentioned as public roads. Learned counsel for appellants argue with great earnestness that the statutes do not declare the roads to be public roads, and this is one of the grounds for attack. We do not think that it was essential to the validity of the statutes that there should be an express declaration therein that the roads have already been es-

tablished as public roads. On the contrary, we hold that, if they are not public roads, it devolves on those assailing the validity of the statute to make it so appear. But, as a matter of fact, the sections of these statutes describing the roads each start out with an express statement that they are public roads, and we think that the attack on this ground is, from any viewpoint, unfounded.

It is alleged in the complaint (and this must be treated on demurrer as true) that there are several public roads from Rogers to Bentonville, and it is contended that this renders uncertain the description of the road "beginning at Rogers, connecting with the above described north and south road, and running west through Bentonville, Centerton to Decatur."

Conceding that there is more than one public road between Rogers and Bentonville, there is nothing to show that there is not a particular one forming the continuous route from Rogers to Decatur so as to answer the description in the statute.

Again, it is argued that the words "thence in a general southerly direction on the most practical route to an intersection with road from Rogers to Garfield," found in the statute giving description of the road from Elkhorn Tavern to Rogers, shows that it is not a public road. Such is not the necessary effect of those words. There may be more than one public road between Pea Ridge and Rogers, and the commissioners are there authorized to select the most practical one.

It is next contended that the roads, particularly in No. 2, in which two of the roads to be improved parallel the eastern and western boundaries, and one runs practically across the county for the purpose of connecting those two roads, are too diverse to constitute one improvement. The boundaries of the district extend three miles on each side of these roads. While the territory is large and the roads to be improved are extensive, we can not say on the face of the statute that these roads can not be treated as a single improvement, and that the finding of the Legislature to that effect is arbitrary.

They fall within the rule announced in the case of *Johns v. Road Improvement Districts of Bradley County, post,* p. 73, decided this day.

The point is made also that the statutes constitute invasions of the jurisdiction of the county court for the reason that there is no provision for the county court to lay out the roads to be improved. The answer to this has already been stated in saying that the roads appear to have already been established as public roads, and it is unnecessary to invoke the jurisdiction of the county court. Each of the statutes provide, however, that the commissioners of each district "may with the consent of the county court of Benton County change the route of any of the roads herein provided for, or eliminate any of them, and may build such laterals as they may deem expedient, the same to be constructed upon highways laid out by the county court." This is a clear recognition in the statute of the jurisdiction of the county court over the subject of public roads, and contitutes an authority to invoke the aid of that jurisdiction for the purposes mentioned. Each of the statutes contains a section, which reads as follows:

"Said board of commissioners are further required to, upon the petition of 51 per cent. of either a majority in number, acreage, or valuation of property owners in any defined district or part of Benton County not now included in this act, asking that additional territory be embraced in this district for the purpose of building or improving any road or roads not now included in this district, it shall be the duty of said board of commissioners to include said territory in said improvement district, and to assume jurisdiction over it, and to proceed to build, maintain and to construct a public road or roads as herein provided in this act."

It is difficult to discover the meaning of the lawmakers from the language used in this provision. It does not provide merely for the change of boundaries for the purpose of including laterals or changes in the route of the road, for that is provided for in another sec-

tion. Giving the language the force which its use necessarily implies, it seems to confer authority for the creation of entirely new districts, but it is ineffectual for that purpose for the reason that there is no provision made in the statute for the assessment of benefits and the levy and collection of taxes for that purpose. The section is entirely inoperative, and is, therefore, void, but that does not affect the validity of the remainder of the statute, which provides that if for any reason any section or part of this act shall be held unconstitutional or invalid, that fact shall not affect the validity of any other part of the statute, "but the remaining portions shall be enforced without regard to that so invalidated." There is no allegation that the commissioners were about to proceed under the section just quoted, and appellants are not entitled to any relief on that score.

In the principal section in each of the statutes, defining the power of the board of commissioners, it is declared that they "are hereby vested with the power and authority, and it is hereby made their duty, to build, construct, maintain and repair said road or roads within said districts as hereby provided." The contention is that this is an attempt to confer authority, not only to construct the original improvement, but that it contains the continuing authority "to maintain and repair" said road or roads, and that to vest such power in the board of commissioners without orders of the county court would constitute an invasion of the jurisdiction of that court over public roads. We do not think that this language, standing alone and without any other provision in the statute to carry it into effect, constitutes sufficient authority for the commissioners to exercise a continuing power in the maintenance and future repair of the roads. The first section declares that the lands described "are hereby made an improvement district for the purpose of constructing and improving highways in Benton County." This appears to be in conflict with the subsequent section, which uses the term "maintain and repair said road or roads." An examination of the entire stat-

ute shows clearly that it was the intention of the lawmakers to provide only for the original improvement and for an assessment of benefits to raise funds to pay therefor. The statute, in other words, treats the project as a single one, and there is no provision for separate contracts for maintenance or repair or for reassessments of benefits for the new work to be done from time to time in the maintenance and repair of the road. The framers of the statute must have used a term in connection with the word "improve" so as to give the language its broadest effect in authorizing the improvement of the public roads described so that there might be found no restriction upon the power of the commissioners to improve the roads, but, in the absence of further provision sufficient to carry out the continuing power to maintain and repair the roads after they have been improved, we must assume that there was no intention on the part of the lawmakers to confer continuing power for that purpose. The words "build, construct, maintain and repair," as used with reference to established public roads, were intended as synonymous terms to express broadly the power to be conferred. The commissioners are authorized in subsequent sections to form only one set of plans for the improvement and to assess benefits accruing only from the original improvement, which shows that the lawmakers did not intend to authorize assessments for future maintenance and repairs. The fact that the commissioners are continued in power after the completion of the improvement does not imply the power to make new contracts for maintenance and repair and to assess benefits arising from the same, for the manifest purpose of continuing the authority of the commissioners was merely to provide for collecting assessments and paying the cost of improvement and the bonds sold for that purpose.

We are, therefore, not called on to decide what would be the effect of a statute which attempts to confer continuing power on the board of commissioners to maintain and repair public roads. Whether or not that would

be an invasion of the jurisdiction of the county court, we need not now consider.

This statute does not, however, contain any provision that the plan for the improvement must be submitted to and approved by the county court, and it is contended that this constitutes an invasion of the county court's jurisdiction. We have never had that question before us for decision, and now for the first time the question is squarely presented whether or not an improvement district created by statute can be authorized to make improvements on public highways without obtaining the approval of the county court. Our conclusion is that the authority to improve a public highway does not invade the jurisdiction of the county court. The road is a public highway, but the improvement is for the betterment of the contiguous lands. The improvement of the road does not in any sense constitute an interference with the general control of the county court over public highways. The authority of the board of commissioners is to bring about a betterment of the highway and not a detriment. The authority of each body, that is to say the board of commissioners and the county court, may be exercised without hindrance to the other. This is illustrated by the decision of this court in the case of *Pulaski Gas Light Co.* v. *Remmel*, 97 Ark. 318, where we held that there was no conflict between the authority of a board of improvement to pave a street and the general authority of the city council over the streets of a municipality. Whenever the powers conflict, that of the board of commissioners must yield to the jurisdiction of the county court, but, as before stated, there arises no necessary conflict from the authority of the commissioners to improve the road. It is suggested that the county court after the completion of the improvement might exercise its jurisdiction over the road and destroy it. This may be true, but it is not to be presumed that a county court would abuse its power; and if it should attempt to do so, remedies are available to prevent it. The county court, in the exercise of its power, is subject

to legislative restrictions, and remedies may be and are afforded for appeals from judgments of the county courts abusing their power.

It is next contended that a provision in the statute for assessment of benefits is contradictory and unenforceable in that the commissioners are required, in making assessments, to enter the lands upon the tax books "in convenient subdivisions as surveyed by the United States Government," and that there is no provision for assessing town lots, which can not be described by subdivisions under the Government surveys. This provision is merely directory, and it does not mean that an assessment of a given tract of land under another description would not be valid. The provision merely designates the most appropriate method of description, but it is only applicable so far as it can be used to describe lands in the district. Other methods of description may be used when the directed method is not applicable.

The contention is made that the statute should be declared void because it gives the board power to vacate public roads, but this is not true, because, as we have already seen, the statute provides that any change in the route must be with the approval of the county court.

There is also a contention that the statute, in confining the limits of the district to lines three miles distant from the roads to be improved, is arbitrary, and that it excludes other lands which may be benefited by the improvement. It is pointed out that lands in the county east of the three-mile limit of the territory along the road paralleling the east boundary of the county will be necessarily benefited because of the opportunity to use the road, and that the same condition exists with reference to lands west of the limits of the boundary of that part of the district which parallels the west line of the county.

We have frequently had similar questions before us, and we have uniformly held that the legislative determination as to benefits is conclusive unless it is manifestly arbitrary and without foundation. The latest case on

this subject is *Bush* v. *Road Improvement District of Lee County,* ms. op.   And another illustrative case is that of *Hill* v. *Echols,* 140 Ark. 474. ·

It is contended that the statute creates a perpetuity by keeping the commissioners in office with power to name their own successors.   No perpetuity is created by these statutes, for the districts are brought into being for specified purposes and last only until those purposes are accomplished.   The commissioners are kept in authority only for that purpose, and there is no inhibition in the Constitution against the method of reappointing commissioners so as to continue the existence of the board until the purposes of the district have been accomplished.   The Constitution does not restrict the power of the Legislature with respect to the method of appointing commissioners of local improvement districts, or in providing for the appointment of their successors. *Reitzammer* v. *Desha Road Imp. Dist. No.* 2, 139 Ark. 168.

We find nothing else in the case which has not been settled by repeated decisions of this court.

It is alleged in the complaint that notices of introduction of the bills for these statutes were not given as required by the Constitution, article 5, section 23, and counsel renew this oft-repeated attack on the validity of the statutes.   In the case of *Davis* v. *Gaines,* 48 Ark. 370, this court held that a presumption will be conclusively indulged that the Legislature found that the notice was given.   The doctrine of that case remains to that extent unimpaired, and has been recognized in all subsequent decisions, including the recent case of *Booe* v. *Road Improvement District,* 141 Ark. 140, where we held that the provision of the Constitution requiring notice is mandatory, and that a presumption in favor of the legislative finding that the notice was given will not be indulged where the circumstances were such that it could not have been given.

The decree of the chancellor is, therefore, affirmed.

HART, J. (dissenting). · Judge WOOD and the writer are content to declare the law as we find it written,

and therefore dissent from that part of the opinion which holds that the statute does not authorize or empower the commissioners to maintain and repair the roads.

The section which confers the power and duty upon the commissioners to make the improvement is the same in each district. In District No. 3 it is section 6 and reads as follows: "The said board of commissioners shall have, and they are hereby vested with the power and authority, and it is hereby made their duty to build, construct, maintain, and repair said road or roads within said district as herein provided, and to carry out the improvements herein contemplated, and in so doing shall expend all necessary sums of money authorized to be levied and collected under the authority of this act, provided, that said commissioners shall not expend more than four thousand dollars ($4,000) per mile in building and constructing the highway or highways herein designated or those that may be designated by said commission under the provisions of this act. Said four thousand dollars to be exclusive of State and Federal aid, and exclusive of all funds derived from the assessment of benefits of railroads and tramways, and said sum to be also exclusive of the amount of interest that shall be required to be paid on bonds of said improvement district."

The framers of the act must be understood to have used words in their natural sense and to have intended what they said. When the language of a statute is plain and conveys a clear and definite meaning, courts should give to the statute the exact meaning conveyed by the language, adding nothing thereto and taking nothing therefrom. When tested by the language used, it is evident that the power to maintain the roads is as plainly and clearly conferred as is the power to construct them in the first instance.

The section provides that the board is hereby vested with the power and authority, and it is hereby made its duty, to build, construct, maintain, and repair said road or roads as herein provided. The language is too plain

to need construction. The power to repair and maintain is as plainly conferred as the power to construct. This is shown by the latter part of the section which limits the cost of construction to $4,000 per mile. If the act is too indefinite to confer the power to make assessments for the repair and maintenance of the roads, it is likewise too indefinite to confer the power to levy assessments to construct the roads. If it is too indefinite to be capable of enforcement in the matter of repairs and maintenance, it is subject to the same vice with regard to construction. The language in the one case is as plain as in the other. The words "as herein provided" as clearly and definitely refer to the maintenance of the roads as they do to the construction thereof. To hold otherwise would be to hold that the General Assembly meant to say that which it did not say, and that it did not say that which in the clearest and plainest language it has said.

But it is said that there is a certain section which provides for the continuation of the commissioners in office, and that it bears out the construction of the majority.

In district 3 this section is No. 1. It first provides that the lands hereafter described are hereby made an improvement district for the purpose of improving certain highways in Benton County, Arkansas. Commissioners are then provided for whose terms of office are fixed at six years. It is then provided that the commissioners, not less than thirty days before the expiration of their term of office, shall elect five commissioners to succeed themselves, whose term of office shall be six years, and who shall hold office until their successors are elected and qualified which shall be done in the same manner. Continuing the sections reads "after which the commissioners of said district shall be maintained in succession in the same way as a board of improvement for the preservation and maintenance of the highway or highways herein contemplated." It will be noted that the language used is not for the preservation and maintenance of the

districts in order to provide for collecting assessments and paying the cost of the improvement. That purpose is provided for in subsequent sections. The language used is that the board shall be maintained in succession in the same way and as a board for the preservation and maintenance of the highways. As we read the law, the maintenance of the board for the preservation and maintenance of the highways does not and can not (except as made so by the decision of the majority) mean continuing the board "merely to provide for collecting assessments and paying the cost of the improvements and the bonds sold for that purpose."

For the sake of convenience it may not be inappropriate to discuss that portion of the opinion which approves the manner of selecting commissioners in succession. As we have just seen, the section provides that the original commissioners shall hold office for a term of six years, and they in turn shall elect their successors for a like term.

In *Board of Improvement of Sewer District No. 2 v. Moreland,* 94 Ark. 380, the court held that the commissioners of the improvement district within a city are public officers. The statutes creating the districts in the case at bar speak of the terms of office of the commissioners. In the first place, we think it is contrary to our American institutions that officers should perpetuate themselves in office, or even that they should be given the power to elect their successors in office. The power given to the board to continue itself in succession is also opposed at least to the spirit of section 19 of our Bill of Rights, which provides that perpetuities and monopolies are contrary to the genius of a republic.

Having reached the conclusion that the statute gives to the commissioners the power to maintain and repair the roads, it becomes necessary to consider whether the authority conferred is violative of article 7, section 28, of the Constitution, which confers upon the county courts exclusive original jurisdiction in all matters relating to roads, bridges, etc. Inasmuch as this question has not

been discussed in the majority opinion, and is therefore a matter subject to judicial determination hereafter, it will be only necessary to briefly state our views on this point. This court has expressly held that under the section of the Constitution just referred to, the Legislature has no power to vest any other tribunal than the county court with jurisdiction over the expenditures of the road funds raised under the general revenue clause of the Constitution. *El Dorado* v. *Union County,* 122 Ark. 184.

This court has repeatedly recognized the wisdom of giving exclusive original jurisdiction to the county courts, not only in laying out, vacating and altering public roads, but also in preserving, repairing and maintaining them. The reason is that the roads are devoted to public use. A public road is a county road which the entire public travels and in which it is interested. Of course, the jurisdiction over roads might have been conferred upon some other tribunal, had the framers of the Constitution seen fit to do so, but, under our Constitution, counties are the units of government, and it was deemed best to vest in them the exclusive original jurisdiction over roads and bridges. It was manifestly intended that one tribunal should have the exclusive original jurisdiction, not only of establishing, vacating and altering highways, but also of preserving, repairing and maintaining the same for the purpose of acquiring uniformity in the system and to the end that the public interests might best be subserved. Otherwise the conflicting interests of the various towns and localities in the county might prevent such a location and maintenance of the roads as would be best for the public good. To illustrate: Benton County is a large county, and there are other public roads in the county that are not to be improved under the acts under consideration in this case. At present the county court has the exclusive jurisdiction to preserve and maintain these roads. If the commissioners should be given charge of the preservation, maintenance and repair of the roads enumerated in the acts in question and the

other public roads are under the jurisdiction of the county court for the same purpose, it is evident that there is and can be no uniformity in preserving, maintaining and repairing the roads of Benton County as a whole. The conflicting interests of the various towns and localities and the divergent views of the various officers given charge of the matter will inevitably result in injury to the public interests.

It is suggested in the majority opinion that if the county court abuses its discretion in any particular, the courts could curb it. Does this mean that the county court is to be a mere figurehead and obey the mandates of the commissioners and approve their suggestions? If so, where is its freedom of judgment or real jurisdiction over roads? To exercise jurisdiction over a subject means to give thought and direction to the subject within well defined limits; but it does not mean that the tribunal exercising the jurisdiction must approve the acts of another body or else be deprived of any voice or judgment in the matter at all.

Again, other road districts might be created until every public road in the county is included in some district. Suppose the commissioners who construct the roads are given jurisdiction to preserve, maintain and repair them; there are usually from three to five commissioners in each district, and they are given the power to appoint agents and servants to aid them in their work. If this should be done, then indeed we shall have, not only an unwieldy and expensive system of maintaining, preserving and repairing our public roads, but one where the conflicting interest of the various districts and localities may work to the injury of the public. We think the framers of the Constitution had in mind the probability, or at least the possibility, of these evils or injurious consequences to the public good, when they placed the exclusive original jurisdiction over roads and bridges under the same tribunal in the various counties. The people vested the exclusive jurisdiction over roads in the same tribunal in each county to the end that there

might be uniformity in the system of constructing and maintaining roads, and to the further end that the tribunal vested with control over them should be elected by the whole people and accountable to them.

We are constrained to concur in that part of the opinion of the majority which holds that the act should not be held invalid because no notice of the intention to apply therefor was given in accordance with the provisions of article 5, section 25, of the Constitution, but for an altogether different reason. We think that the provisions of section 25, article 5, of the Constitution were intended to be mandatory, and should have been so construed in the case of *Davis* v. *Gaines*, 48 Ark. 370, instead of having been held to be directory merely. We would be in favor of overruling altogether the holding in that case to the effect that the question of whether notice was given as required by the Constitution was not open to judicial review, were it not that such decision would operate retrospectively and would disturb vested rights. It is true that some of the reasoning in the recent case of *Booe* v. *Road Imp. Dist. No. 4 of Prairie County,* 141 Ark. 140, is opposed to this view, but the reasoning was not necessary to the decision made and was used to show that the court would not be in favor of making a decision which would disturb vested rights. The opinion proceeded on the theory that the decisions of a court operate retroactively, and rights which should be regarded as certain and fixed should not be disturbed. Property is purchased and investments are made upon the faith of the stability of the decisions of a court, and more harm than good would result from rendering decisions which would impair the obligation of contracts or disturb vested rights, even though the decisions overruled were manifestly wrong and unjust. All that was necessary to decide in the Booe case was that the passage of an act is conclusive of the fact that due notice of the intention to apply for the passage of a special bill was given unless the records of which the courts may take judicial notice show otherwise. As pointed out in that opinion,

courts can not act upon admissions or proof made by the parties in determining the constitutionality of statutes. If this were so, laws could be made or abrogated by agreement or by proof made during the trial at the option of litigants. Where courts have record evidence to guide them as to the question of notice, all uncertainty with regard to the giving of the notice will be eliminated.

The section of the Constitution with regard to giving notice provides that the Legislature may prescribe the manner of giving it. It further provides that the evidence of such notice having been published shall be exhibited in the General Assembly before such act shall be passed. One of the meanings in law given to the verb exhibit, by Webster, is to file for record. Hence we think the framers of the Constitution intended that evidence of the notice should be filed for record in the Legislature. The court then could judicially take notice of that record and conclusively ascertain whether or not the mandate of the Constitution had been complied with. If any evidence of such notice having been published appeared on file as a part of the records of the Legislature, the court for the reasons above given would not inquire into the sufficiency of the notice, but would indulge the conclusive presumption that the Legislature had determined that it had been given in the manner required by the Constitution. On the other hand if there was nothing filed of record in the Legislature, this would be conclusive proof that the evidence of the notice having been published had not been exhibited to the Legislature and that the mandatory provision of the Constitution had not been complied with.

If any of the reasoning in the Booe case should be opposed to this view, it could be eliminated without overturning the soundness of that decision and would not disturb vested rights. The case of *Davis* v. *Gaines, supra,* however was decided at the November term, 1886, of this court, and since that time many special acts have been passed and rights have grown up under them. To set aside the line of decisions on this question

following that case at this date might result in more harm than good in the administration of justice and would necessarily disturb vested rights  In expressing the view that a decision now overruling a former decision construing a provision of our Constitution would have a retroative effect, we are not unmindful of the long established doctrine of the Supreme Court of the the United States to the effect that the question arising in a statute in a Federal · court where vested rights have acrued is to be determined by the law as judicially declared by the highest court of the State when the rights accrue and that the rights and obligations accruing under such state of the law would not be affected by a different course of judicial decisions subsequently rendered any more than by subsequent legislation. *Loeb* v. *Columbia Township Trustees,* 179 U. S. 472. The court however in that case recognized that the decision of the State court overruling a former decision acts retroactively, and pointed out that this was the effect of the holding in *Central Land Co.* v. *Laidley,* 159 U. S. 103. In the latter case it was held that under the statute giving the Supreme Court of the United States authority to review the judgment of the highest court of the State, the Supreme Court of the United States was without jurisdiction if the action of the State court was impeached simply on the ground that it had not determined the rights of the plaintiff in error in accordance with its decisions in force when those rights accrued, but had followed its decisions of a contrary character rendered after his rights had accrued.

In *Tolliver* v. *Barnett,* 47 Ark. 359, the court held that the· decision of a court overruling a previous decision .of a court operates retrospectively. Chief Justice COCKRILL said: "A decision of the court when overruled stands as though it had never been, and the court in the reversing judgment declares what the rule of law was in fact when the erroneous decision was made."

Again in *Apel* v. *Kelsey,* 52 Ark. 342, the court in discussing the question, speaking through Judge SAN-

DELS, said that former interpreations of the law have become rules of property, and can not be overturned without uprooting the title to one-fourth of the property of the State.

What we have said in the dissenting opinion in *Johns* v. *Road Imp. Dist.* applies with equal force to this case and need not be repeated here.